Thank you all for being here. Our court is always glad to come to the University of Illinois Law School to do oral arguments. Of course you know that the court would normally hold the oral arguments in the courthouse in Springfield, but once a year we take a road trip to U of I. So we had a criminal case first on the docket this morning, and we have a civil case now beginning at 1130. Counsel, thank you for being here. The justices of the 4th District Appellate Court appreciate your attendance. Just by way of caution for everyone, if you have a cell phone, and I know you do, turn it off right now please. Make sure it's off. And just a little word about the court. I'm sure you have already in your studies been studying the work of the court and how the court is made up. So the seven justices are elected with one assigned member, and they are elected from various places in the district. The 4th District runs from Pontiac, Livingston County, to the north, all the way down to Jersey County, and to both borders, east and west of the state. So we cover a lot of geographic area, and our court usually has oral arguments three to four times a month. So we're glad to be here today. I'm going to go back and let the judges know that we're ready to get started. The bailiff will have all of you rise once the judges are walking onto the bench, and then he'll have you be seated when they sit down. So thank you again for being here. Thank you. All right, thank you. Please be seated. This next case is Case Number 4-17-0028, Donna Vancex v. Mickey Griffith. Appearing for the appellant is Attorney Kevin Sanborn, and for the appellee is Attorney Vincent, is it Tessitore? Yes, Your Honor. All right, thank you. Mr. Sanborn, you may proceed. Thank you very much. Good morning, Justices, Counsel. May it please the Court. Your Honor, we are here today because of an order of a stalking no contact order hearing. There was a trial that lasted over two days for the trial court. During that time, evidence was presented, and evidence was presented of what we would term as harassment from each petitioner and the respondent. The evidence bore out that the respondent was provoked by the petitioner into his actions. The respondent then harassed the petitioner. The petitioner sought relief for the harassment under the stalking no contact provisions. After the hearing, the judge ruled that despite the harassment that was on both sides, he ruled in favor of the petitioner in this particular case granting a two-year order of protection, excuse me, stalking no contact order, and set off for fees to a later date. During that time, the petitioner filed a motion to vacate the judgment, explaining again our position of something I would like to call a doctrine of unclean hands or a similar doctrine to such a thing. Let me pause it right there. Absent the doctrine for just a moment in your argument, is there any problem with the sufficiency of the evidence to have supported the trial court's initial judgment? No, Your Honor. We believe that harassment did occur. In fact, the respondent admitted to such during the hearing. He admitted to various forms of what would under the statute be grounds for harassment, at least on two different occasions. The premise of that harassment, though, is that he was responding to harassment from the petitioner. When did it all start? Because from my memory of reading the case, it went back at least a couple of years, didn't it? It did. The initial falling out between the neighbors, and they were neighbors in this particular case, started back in 2013 where there was some dispute about neighbors taking side against neighbor. At some point in time during that year, the respondent told the petitioner to get off his property. The petitioner at that point in time said that she would do everything in her power to ruin his life. And it goes on for a number of years. In fact, there's civil litigation involved in a separate issue besides the stalking no contact order that involved a property dispute about where an easement lies between these neighbors. The easement in question involved a driveway. The respondent's property is essentially landlocked, cannot be accessed yet but through the petitioner's property. And there was an easement of a driveway so that the respondent could access the property. There was a dispute among that, and it was a costly dispute. Each side, I believe the petitioner testified that she spent about $7,000 to $8,000 in litigation fees. If I can, I would just like to get right to the unclean hands doctrine here, the theory that you're suggesting here, and that is that a petitioner in a stalking no contact case can't get an order if he or she comes in with unclean hands. In other words, was guilty of harassment prior to the acts that are at issue in the case. Essentially, is that it? Yes, Your Honor. Okay, so if we have a case where the interactions between the parties goes back months, and here even years, what do you do? Do you have to go back to the initial act and figure out who it was that initiated the first contact that then provoked the back and forth to determine whether that party can get a stalking no contact order and the other one can't? In this particular case, the harassment just doesn't span back years. It also spans to the contemporaneous time that the petitioner alleged in her petition. The respondent testified that every time that he harassed her, he was responding to some sort of harassment. And what period of time would pass between these acts? Well, from the initial response during the hearing is he would be provoked and then immediately he would provoke back or he would provoke back at another time. But in fact, it wasn't immediate. You analogize your theory, the unclean hands doctrine being applicable to these types of cases to self-defense in a criminal case. And there you're talking about a contemporaneous reaction, the self-defense. But here you're talking about what, based on what I read, would be actually days that would pass between these acts of harassment between the parties. And I would concede, Your Honor, that sometimes there would be time passing between the initial harassment and the response of harassment. But in this particular case, the court has analogized, and I've also analogized in my brief, the term of self-defense. What I'm analogizing is that a person who is wronging cannot then go to the court and ask for remedy because they began the wrong. They do not have clean hands. The courts are put in place so that people can gather justice in this particular case. You cannot have justice or be fair if the person who began the wrongdoing ends up the victor to further harass and further wrongdo the initial victim. We have, not only in self-defense, do we have that doctrine. We have the doctrine in criminal. We have the doctrine in civil, self-defense, and unclean hands. We would be asking for either the doctrine of unclean hands to be specifically allowed in this case or an analogous doctrine. Because in this particular case, what we have here, and I think the court also talked about it, we have a statute with virtually no limit. The trial court opined that even surveillance by law enforcement or business owners could be considered harassment, given the broad nature of the statute. Following up on the question by Justice Harris, you cited Carlisle v. Jaskiewicz for the proposition that under the doctrine of unclean hands, neither a petitioner nor any party to a suit shall benefit from their wrongdoing. In essence, you must have clean hands to obtain relief. So how far back do you have to go? You're saying that, well, in this case, you just go back a few days. But in reality, you said this started back in 2013, I think. The falling out between the neighbors started out in 2013. So you have to go back to there to find out who's the initial aggressor, if you use your self-defense argument, or who is the person who started the problem, if you use your unclean hand. Your Honor, I believe the initial falling out began in 2013. But the harassing actions would be contemporaneous with the petition. It would be within a few days of the actual timeline of the petition. I thought there had been a series of petitions. There's been one in Livingston County. There's been one that was reversed on appeal. So there's been a course of conduct over an extended period of time, hasn't there? Yes, there has, Your Honor. So how do we determine who's got the unclean hands in that situation? I think it would have to go by fact case, a case-by-case basis, as the unclean hands doctrine does originally. In this case, you have a lot of litigation, both in the civil realm and in the stocking order protection, that bled into, as the petition alleges and this record illuminates, bled into criminal sanctions where Mr. Griffith was arrested based upon an order, a stocking no contact order that was later reversed. Therefore, he suffered the indignity of being arrested for an order that was void. There was a request for an emergency order that was denied. Yes. Was there a reason given? I wasn't a part of that. It was an ex parte proceeding. There was no defense counsel to reason why the emergency order of protection was denied. I could only guess at that, Your Honor. And I would assume that the trial court followed the law and found one of two things. Either there was no factual basis or there were no exigent or emergency circumstances to warrant such remedy. Counsel, let me ask you a couple of questions about all this. Is my understanding correct that there is no case law on the point, the precise point at issue here, whether the unclean hands doctrine applies to a stocking no contact order that's applicable in this case? None that I could find, Your Honor. Okay. And I would also assume that it could not be found by the petitioner in this case. Now, as your brief shows, you're familiar with the notion that the unclean hands doctrine has generally not been favored by the courts, number one. And number two, it appears that this is a doctrine which has arisen primarily in the context of equity proceedings where what's at issue is paper transactions, a claim of, well, you committed fraud upon me, so you shouldn't be able to get specific performance, et cetera. This seems far afield from what we're dealing with here. It's not an equity. It's pursuing a statutory remedy. It's not really an equitable matter. plus the notion that this has not been favored by the courts, the unclean hands doctrine. Given all this, why should we apply it here? Why shouldn't we just leave this as a matter of the trial court's ultimate discretion in deciding whether or not to issue the order in the first place? Your Honor, we're asking for either the unclean hands doctrine to be applied itself or for an analogous doctrine. What would that be? The analogous doctrine? One cannot benefit from a stalking no contact order if you yourself harassed or stalked the person, the respondent. And as far as going for a bright line rule of what the court's concern was about timing, that would be determined by a case-by-case basis. But the statute itself has no defense in it. It doesn't recognize any defense. I would assume that even if it was contemporaneous conduct, say, for instance, in self-defense I attack somebody, they could then twice, on two different occasions, they could then file a stalking no contact suit and have relief under the act because the act is unlimited. Let me suggest to you that what you're saying should be applied in the way of the unclean hands doctrine is already contemplated by the statute as an element of proof for the petitioner, and that regardless of what you think of the clarity of the statute, it does set forth the definition of contact, and the action is basically defined through the definition section of the statute. But it says contact includes any contact with the victim that is initiated or continued without the victim's consent. And so there the petitioner has to establish that the respondent initiated the contact here. And the respondent can say in defense of the action, well, you know, I didn't initiate it, you know, she did. Isn't that the equivalent of what you're saying should be done in terms of the application of the unclean hands doctrine? Not necessarily. Even an aggressor can say, well, I didn't consent to what they did back to me when I was the initial aggressor. Sure, I may have called them names, but I did not give them consent to call me names or harass me further. Also, it goes down to the look of the timing as well as the court has rightly looked at. Some of these acts happened a few days in retaliation to what happened to the respondent a few days prior. What really boils down to in our mind is what you have here is a dispute between two neighbors that goes back years. They bring the dispute to the court. It is a tit-for-tat situation. Each is harassing the other. One benefits from filing first and being victorious first. The other does not. The statute excludes mutual orders of no stalking, no contact orders. So then we have a problem of it's a race to the court between two parties, for lack of a better term, who hate each other. Well, it's a race to the court only because your client admittedly engaged in acts of harassment, right? He did. In response to being harassed himself, though. And that is what I believe the evidence even bears out. Even the petitioner did say that she would say something sometimes. She has plenty of motive to start the harassment. We have the litigation between the two parties. We have also the fact that the previous order had been vacated and that the criminal charge had been thrown out. The petitioner who said that she was so afraid of the respondent even showed up on the arraignment date, as is her right, of the criminal trial just to see. I would argue to gloat about having Mr. Griffith arrested and charged with a crime. So we have here a specific example of neighbors not getting along with each other. Never gotten to violence. And I believe even the court's concerned that they would be at each other's throats if he did not order this. There are laws on the books already that stop physical violence, even the type of harassment that may have occurred or did occur in this case. But even the criminal justice system refused to get their hands into this. Probably because they saw this was an equitable situation where both parties were in the wrong. So in essence, if both parties are in the wrong, the court cannot be the sword instead of the shield. They should not be taking sides in what is essentially two wrongs. Isn't there a concern expressed by the legislature by enacting the statute that when things are really ugly, especially between neighbors like here, you can hardly avoid each other unless someone sells and moves away, that there's a potential for the situation to escalate into literally violence or some other dangerous sorts of behavior so that the courts need to intervene to do something about this, to address it, so that that situation doesn't develop. In that case, I would look at the remedies available for violation of the order. There are criminal remedies of violating the contract of continued harassment. Perhaps I'm not being clear. I'm talking about the reason for the statute in the first place and the authority for the court. After hearing all this, the court, with my sympathy, hear two days' worth of testimony about how each one of these people was so awful and other people being called. Going back to my trial judge experiences, it must have been a nightmare to have to listen to all this. But, you know, there it is. And surely there must be some role for the court to try to intervene to stop this before it escalates, isn't there? Your Honor, I would fundamentally disagree with the role of the court. The role of the court is not to be arbitrarily a peacemaker. It is to settle disputes. Well, we've got a real dispute here, don't we? What you're essentially saying is these people are so awful to each other that the court just ought to back away and say, you work it out. Can that really be what the statute was designed to do? Your Honor, I don't believe the statute was designed to reward people for engaging in the type of conduct that both parties went into in this particular case. Look, counsel, I mean, you've indicated that your client committed the acts that under the statute would qualify for the type of order that was entered here. And you're suggesting that the converse is true. There were previous acts committed by petitioner that could have allowed for your client to obtain a stalking no-contact order. It's not a perfect analogy, but in domestic battery cases, you know, a police officer arrives and both the husband and wife are battered and bloodied and, you know, trying to figure out, okay, who was the aggressor here? And the officer says, somebody's going to jail. And, you know, essentially that's what you have here. You've got a protracted period of time in which you have two parties committing acts against each other that individually constitute conduct that's controlled by the act here. So, you know, just because, you know, a period of time passed and the other side committed these acts of harassment, it would seem very difficult, it would put the trial court in a very difficult situation to apply the unclean hands doctrine here. And I see the court's point. And the analogy, as the court has suggested, isn't the same as we have here. We don't have a law enforcement officer determining whether or not they have probable cause to arrest somebody in this particular case. What we have here is a judge finding by preponderance of the evidence whether the elements have been met, finding that there are no affirmative defenses or defenses whatsoever, and then imposing sanction upon the other, the respondent party based on the fact that the judge found there are no defenses according to the act. And the trial judge, just to address some more points, says that they have these type of cases all the time where neighbor turns against neighbor and it becomes a contest of which neighbor can make each other's life worse. And I understand the court's proposition in this case, but maybe it's better for the court not to be the arbiter of neighborly disputes, but rather to be what is fair, what is just. Not to be the prophylactic against further violence. We have many laws that prohibit violence and are the prophylactic. But in this particular case, I believe the statute is virtually unlimited. It needs to be limited by the court because the legislature has overreached in this particular case. All right. Thank you, Mr. Sanborn. Thank you. You'll have time in rebuttal. Mr. Tessitore. Good morning, Your Honors. May it please the court. Counsel. Your Honors, with respect to the first issue, I would make three main contentions. Number one, that the trial court did indeed consider evidence analogous to unclean hands. Number two, that even if the trial court had not done that, that would have been within the sound discretion of the trial court. And thirdly, that the trial court did not find, as counsel contends, that it was without authority to apply the doctrine of unclean hands. To the first contention, Your Honors. Pausing right there. Yes, Your Honor. If the trial court did not so conclude, should it have? It should not have, Your Honor. I mean, this goes to whether or not the equitable doctrine of unclean hands can be applied to an equitable remedy. There is, as counsel said, no case law with respect to the No Stalking, No Contact Act. But the No Stalking, No Contact Act does reference that it's an equitable remedy being sought. It is. And the doctrine of unclean hands, it is well settled under Illinois appellate case law, and I've cited many of those in my brief, is an equitable doctrine that can be applied to equitable remedies. Are there any cases that say that an equitable remedy is available in a statutory action? The statute itself says that the remedies under the Stalking, No Contact Act are equitable. But all of the evidence that the respondent desired to present concerning the petitioner's conduct was indeed allowed and considered by the trial court. In fact, the respondent was the only witness who testified on behalf of the respondent's side, and of the 18 specific occasions of stalking that were presented by the petitioner, the respondent admitted six of them, denied only three of them, and with respect to the remaining nine, presented no testimony or evidence whatsoever to rebut them. But with respect to the episodes that he did admit, the respondent's excuse was the petitioner's conduct, and the respondent was allowed to present as much evidence and testimony as he wanted on the petitioner's conduct. The respondent's testimony, which was the only testimony offered concerning the petitioner's conduct, included that the petitioner had been videotaping him, that on an unspecified occasion, the petitioner had yelled at him and his wife. She didn't shout obscenities or hurl insults, she just yelled at them on one unspecified occasion, and that on other unspecified occasions there were obstructions in the easement area that both parties have to traverse. All these excuses were allowed and considered by the trial court. In fact, the trial court made very specific findings at the closing of the proofs and closing arguments, and of those specific findings was that the petitioner's conduct was reasonable. And the trial court specifically stated in that finding, and I think this is very important because it goes to the heart of whether the trial court considered the equitable doctrine of unclean hands, the trial court stated, and I find that her reactions are not the reactions of an unreasonable person. I believe that she is acting reasonable and reacting the way that she has to these particular events. The trial court went on further in its specific findings at the conclusion of the trial to find that with respect to the respondent's conduct, the respondent's conduct occurred for no other reason other than just pure meanness. The trial court then went on to describe the petitioner and her husband's testimony concerning the emotional distress suffered as that testimony being certainly credible. The trial court further described the respondent's conduct as hateful. Thus, the first issue presented on appeal is indeed a red herring, Your Honor. The trial court, in fact, did consider evidence of the doctrine of unclean hands and specifically found the petitioner's conduct to be reasonable. After all, when we are talking about whether the equitable doctrine of unclean hands was applied, we're asking the question as to whether or not the petitioner's conduct was evaluated and considered by the trial court, and indeed it was here. I ask Mr. Sanborn this. I mean, doesn't the statute itself require that the court determine whether or not the contact was initiated by the respondent without the victim's consent? It does, Your Honor. So doesn't the court, in essence, make that determination as to unclean hands? But because of what the statute requires, the trial court has to determine whether the contact was initiated and therefore there's a starting point here. So in this case, the trial court made the determination that the respondent initiated the contact. That's correct, Your Honor. And with respect to that finding and all of the other evidence to support the contentions of the petition with respect to the stalking episodes, the trial court found that the evidence was overwhelming, and that was the term that the trial court used, overwhelming. Your Honors, even if the trial court had not considered the defense of unclean hands, that was completely within its sound discretion to do so. It's well settled in Illinois that it is within the sound discretion of the trial court as to whether to apply the doctrine of unclean hands, and thus the trial court's decision in that regard should not be disturbed on appeal absent an abuse of that discretion. Let me ask you a question about that, Counsel. So Mr. Sanborn argued that one of the problems with this statute in a situation where both sides are engaging in bad conduct is that by not applying the unclean hands doctrine, we're essentially rewarding the person who wins the race to the courthouse. Doesn't he have a good point about that? Well, I imagine in a case where both sides were at fault and there was misconduct on both sides and it couldn't be determined who initiated it and who was at fault, then that would be a problem. But in applying the doctrine of unclean hands in this case, the trial court found that, in fact, the petitioner's conduct was reasonable and the respondent's conduct was done out of pure meanness and hatred. In fact, we didn't even have testimony from the respondent concerning most of the acts complained of. Well, if it's something to be concerned about, namely providing a premium for winning the race to the courthouse as being inconsistent with the statute, is there some way that this court can address that to diminish that incentive? Well, I don't think it would be a question with the current statutory language implying or inferring in any way that it's a race to the courthouse because in applying the statutory language that Justice Harris pointed out about initiating the conduct and in applying the doctrine of unclean hands, you're determining which one was at fault and which one wasn't. So regardless as to who filed first or if there was only one person to file, you're still making a determination at the trial court level as to who was at fault and who wasn't. And like in this case, if there's a finding that the petitioner was acting reasonably and the respondent was acting out of pure meanness, then, of course, there would be a finding, like in this case, in favor of the petitioner. But I think if you're taking those considerations into account, as the trial court did in this case, it wouldn't matter who filed first. Now, counsel argues that the trial court felt it didn't have the authority to apply the doctrine of unclean hands, and there's simply no support in the record for this. The respondent's attempt to manufacture support for this petition come from a motion to reconsider hearing that was held two months after the trial. Prior to denying the motion to reconsider, the trial judge engaged in a general academic discussion about his perceived problems with the act. As counsel mentioned, the trial judge talked about how there's no specification with respect to surveillance and that maybe the trial judge or someone else could be at a stoplight with red light cameras or in public where a security camera is present, and if that person reasonably feared for or was reasonably suffering emotional distress because of those situations, that maybe a no-stalking, no-contact order could be obtained against the police or the county or the state. And as the trial court was having this sort of academic discussion, the trial court said, you know, should I just say a plague on both your houses? You're both at fault. But then the trial court went in specifically addressing the argument that respondent's counsel was making concerning the equitable doctrine of unclean hands when the trial court said, you know, essentially the petitioner is arguing or the respondent is arguing that the petitioner can do no wrong, that the petitioner has to be perfect, and that's not the law. And the trial court was right. That isn't the law of the doctrine of unclean hands. It's well settled in Illinois that in order to prevail on the equitable hands doctrine or the equitable doctrine of unclean hands, the party making the contention must prove that the other party is in fact guilty of fraud, misconduct, or bad faith towards the party making the contention. Again, the trial court found that there was no fraud, misconduct, or bad faith on behalf of the petitioner. So the trial court's finding that the petitioner acted reasonably necessarily implies that the petitioner's hands were not unclean. In fact, at the motion to reconsider hearing, I reminded the trial judge that he had made no findings whatsoever that the respondent's conduct was retaliatory in nature at all. After I spoke, respondent's counsel had the opportunity to speak, and then the trial court spoke, and there was no disagreement with that statement that I made because it was supported by the record and the specific findings made two months prior by the trial court. With respect to the second issue, the unclean hands doctrine should not and does not bar entry of the plenary order. Respondent's allegations of unclean hands are simply not supported by the evidence. The trial judge properly found that the petitioner acted reasonably, and the plenary order, as the trial judge stated, is well supported by the evidence. In order to prevail on an unclean hands defense, the respondent would have to prove that the petitioner's conduct rose to that level of bad faith, fraud, or misconduct, and the petitioner would also have to prove that with respect to each and every incident of the stalking occasions that were proven by the petitioner. In Illinois, misconduct on the part of a plaintiff that will defeat recovery in a court of equity under the unclean hands doctrine must have been conduct in connection with the very transaction being considered or complained of, and must have been misconduct, fraud, or bad faith toward the defendant making the contention. And this goes to the discussion, Your Honors, we're having with counsel earlier about when do we start the timetable. Well, the Ball v. McDonald's Corp. case that I've cited from the First District and a few other cases address this issue and talk about that the unclean hands doctrine has to relate to the very transactions that are being complained of. In this case, all of the stalking episodes that were set forth in the petition of the petitioner and in the testimony and evidence brought by the petitioner. Incredibly, the respondent claims in their brief that the trial court found that both parties were at fault. The trial court made no such finding. The respondent is referring to the comment I made earlier from the trial court two months later at the motion to reconsider hearing when the trial court was engaging in a general academic discussion about the act and hypothecating concerning the act. The judge at the motion to reconsider hearing actually ultimately found that the findings of the court from two months previous were ample in relation to the evidence. The trial court specifically stated at that hearing the testimony was ample in relation to the findings of the court and the motion to reconsider is denied. Obviously, those findings of the trial court that the trial judge was referring to at the motion to reconsider hearing included the findings that the petitioner acted reasonably and that the respondent acted out of pure meanness and hatred. Looking at the evidence more particularly, the evidence in this case that the respondent presented testimony on and that the petitioner presented testimony and other evidence on was overwhelming. As I mentioned, nine specific dates of stalking by the petitioner went completely unrebutted. Eight of those episodes included eight specific dates where the respondent shouted insults, hurled obscenities, and played loud music at the petitioner's home. The ninth episode the petitioner testified was actually the most frightening episode to her. On April 3, 2016, she sat down to have dinner and looked up and the respondent was staring at her directly through her window and it frightened her very much because the respondent had never gotten that close to her home before. With respect to the episodes that the petitioner did admit, I'm sorry, that the respondent did admit, the respondent admitted that it was his voice in audio court recordings played before the court on June 13, 2015, where the respondent was shouting obscenities, hurling insults, and saying very insulting things. The petitioner's mother-in-law had just passed away. The respondent was shouting on this occasion and others that you killed your mother-in-law for the money. The respondent admitted making those statements and that they were directed towards the petitioner and that he was playing music directed towards the petitioner's home. The respondent also admitted that on Christmas of 2015, he drove by the petitioner's home, kicked up gravel at her home on purpose, and then the respondent was asked thirdly on September 2015 if that was another day where he shouted obscenities, hurled insults, and played loud music at the petitioner's home. The respondent testified that he couldn't recall whether on that day he did that. His attorney then asked him if it sounded like something he would do, and he responded, I might have did it. Fourth and fifth, the respondent admitted placing cameras on his property in July and June of 2015 directed towards surveilling the petitioner. The respondent claimed that they were only pointed towards the easement area, but they were still pointed in that area to surveil the petitioner. And then the respondent also admitted that he, on occasion, drove by the petitioner's home and kicked up gravel on purpose at her home. The only three rebuttals by the respondent were very weak rebuttals. One of them was a rebuttal of the petitioner's testimony that the respondent, outside of the courtroom, walked into the hallway and extended his middle finger towards the petitioner. The respondent said he did not do that. But then we had the courthouse deputy come and testify and rebuttal, and she said she was there and saw him do it. The respondent also denied coming out of the courtroom in September of 2015 and charging at the petitioner's husband. The respondent's claim was that he was just walking out of the courtroom fast. The respondent further denied that on December 6, 2015, he drove by and kicked up rocks at the petitioner's home, but he did admit doing that on other occasions. Your Honors, as the trial court put it, the evidence in this case to support the no-stalking, the no-contact, no-stalking order was overwhelming. We only had to prove two instances under the act, and I submit to you that we proved 18, but at least 15. There were nine unrebutted incidences and six were admitted. So with that, Your Honors, I would ask that the trial court's ruling, if there's no further questions by Your Honors, be affirmed. All right, thank you. Thank you. Mr. Sanborn, rebuttal argument? Yes, thank you very much, Justice. Your Honors, what we heard is a litany of the sins of Mr. Griffith. We concede that Mr. Griffith acted improperly. The point is so did the petitioner in instigating those improper actions. And when looking at the court, I think it's good to note what the court actually said. During the motion to vacate, the court actually said, but I agree, things need clarification, whether by statute or by this body. The court also noted that, opined that if there are no protections, if you're not innocent, then there are no protections. And counsel then went on about transactions. The transactions in the McDonald case are financial transactions, contemporaneous, and sometimes those actions or transactions continue on for days, months, or years. There's no set time limit for transactions, as the court asked me previously. It goes by a case-by-case basis. What we have here are two litigants who harass one another. One went to the courthouse and found relief and was rewarded for their harassment. The other, mutually harassing the petitioner, lost. You mentioned earlier about your concern about encouraging racists in the courthouse to the extent that that's the situation. Why did your client lose? That is, why didn't he, if he thought he was the victim of her harassment and that the stalking no contact statute would apply to his situation, why didn't he pursue it? Your Honor, if we aspire to the motivations of why someone files a suit and why someone doesn't file a suit, then we are creating the very monster that we're trying to avoid in this particular case, which is one aggrieved party in a mutual situation getting the idea, either however they get the idea, they talk to a lawyer, they hear about it on TV or some advertisement, or one of their friends says, hey, try out this, it worked for me. We're ascribing to them that they had the idea first to go to court. Whether Mr. Griffith knew about it and declined to because he doesn't feel he's a litigious person, whether he felt he didn't have a case, whether he felt disempowered because he couldn't find anyone to help him. The record will note he also informed police about the harassment that was going on, that he suffered at the hands of the petitioner, and the police in that particular case didn't make any arrests either, much like as the record shows that the petitioner also called police, didn't find satisfaction with the police, and for one reason or another went to the courthouse. We are creating then, if we look at the intentions of why one party didn't file and one party did file, we are creating the monster we're trying to avoid here, which is not rewarding the first person who says time to go to court and we need to have more litigation in our society. So if we concede the bad acts in this particular case and the transactions that are referred to in the McDonald case are financial transactions, which the court knows can take months, days, years to transact, then we're not really talking about a bright line rule about how long it takes for these bad acts to occur or these transactions. We're not actually talking about either how bad the harassment was, whether one party was worse than the other. What we are talking about in this particular case is who gets justice, who gets fairness, which is the crux of what the courts are. The courts are a crucible in which all cases, all cases, the irrelevancies are burned away until we get to the fundamental truth of the matter and a fair decision brought. I cannot think of one thing more unfair than a wrongdoer profiting in continuing to harass, and this time with legal sanction. Any violation, alleged violation of this order, is enforceable by law enforcement, by immediate arrest, by being charged with a class A misdemeanor. Secondary transactions or violations of that order can be a felony. The consequences for this type of order are immense. There are numerous rights that a citizen loses when a stalking no contact order is filed against them, numerous consequences, collateral consequences. All right. Mr. Sanborn, you're out of time. Thank you. Thank you. Thank you both. It's an interesting case. The case will be taken under advisement and a written decision shall issue. The court stands in recess.